MARION F. EDWARDS, Judge.
 

 | gDefendant/appellant, Steven M. Hon-oré (“Honoré”), appeals his conviction of one count of second degree murder, a violation of LSA-R.S. 14:30.1. We affirm.
 

 Following his arraignment, Honoré filed various pre-trial motions. The trial court denied his motions to suppress evidence, statement, and identification. Honoré proceeded to trial on March 10, 2008 throughout which he moved for mistrials and a new trial, all of which were denied. Ultimately, a twelve-person jury found Honoré guilty as charged. Following the denial of
 
 *488
 
 a motion for new trial, Honoré was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
 

 On November 19, 2004, between 3:22 and 3:25 a.m., Ernie Jacobs (“the victim”) was the victim of a shooting homicide in Kenner that occurred outside of a club known as Robinson’s Place in the 500 block of Taylor Street in Jefferson Parish. The victim sustained three non-lethal gunshot wounds to his arm, shoulder, and thigh and died as a result of one lethal gunshot wound to his head.
 

 |aBetween 3:22 and 3:25 a.m., Officer Anthony Roach (“Officer Roach”) of the Kenner Police Department was on Airline Highway, making a turn onto the 700 block of Taylor Street, when he saw a small gray vehicle speeding across the railroad tracks. Officer Roach got behind the vehicle, turned on his lights and siren, and initiated a traffic stop. Officer Roach pulled the vehicle over at the intersection of Airline and North Bengal, after the vehicle had passed Waldo Street.
 

 The driver immediately opened his vehicle door and exited. At the same time, Officer Roach saw the front and rear passenger doors open. The front passenger stuck his head out and looked back at him, and the other passenger exited the rear passenger door. Officer Roach told the rear passenger to get back into the vehicle, and he complied. Officer Roach believed there were four or five people in the car.
 

 The driver approached Officer Roach and said he did not have a driver’s license on him. Officer Roach testified that the driver said his name was Corey Fisher (“Fisher”). He handcuffed the driver. At the time, he intended to cite the driver for reckless operation and no driver’s license. However, three or four minutes into the stop, Officer Roach was advised by radio of a shooting on Taylor Street near “Robinson Bar.” Because he was close to the scene, Officer Roach removed the handcuffs from the driver and released him. Officer Roach testified that he had an “uneasy feeling” about the vehicle, so before he left he wrote down the vehicle’s license plate number.
 

 When Officer Roach arrived at the scene of the shooting, the victim was lying on the ground. Another officer told Officer Roach that he spoke with a witness who advised him that the vehicle that had been stopped was involved in the shooting. Thereafter, Officer Roach notified headquarters of the license plate Rnumber, and they put out a bulletin for the 2003 Toyota Corolla as being a vehicle that was possibly linked to the homicide. Officer Roach gave descriptions of the occupants in the vehicle he stopped to Detective Keith For-sythe (“Detective Forsythe”) of the Ken-ner Police Department. Officer Roach described the driver, the passenger trying to exit, and the front passenger who looked back at him.
 

 At approximately 4:11 a.m., Officer Michael Schmitt, a Crescent City Connection police officer, stopped the speeding Toyota vehicle at a gas station. There were two occupants in the vehicle — Honoré and Donnell James (“James”). They were searched, handcuffed, and placed into separate police cars. Thereafter, Detective Forsythe and then Officer Roach arrived. Officer Roach told Detective Forsythe that the two subjects were the same subjects he observed earlier at the traffic stop on Airline Highway. He identified Honoré as the driver of the car he had previously stopped and stated that James was one of the passengers trying to exit the vehicle stopped on Airline Highway. Detective Forsythe testified that Honoré was wearing a tan-colored Dickies button-down shirt with matching Dickies long pants and
 
 *489
 
 a yellow T-shirt underneath, which had a large picture on the front of it.
 

 After Honoré was removed from the rear of the police unit, five $100 bills were found hidden underneath the seat of the unit where he had been detained. James was in possession of $740, which was found hidden underneath the insole of his shoe. After Detective Forsythe advised Honoré of his
 
 Miranda
 
 rights, Honoré stated that he was at the club in Kenner, in that vehicle, and that he was the only one who had operated the vehicle that night. He refused to identify anyone else with him in the vehicle, and he denied that he had been stopped by the police that night in the vehicle.
 

 | fiAt trial, Detective Forsythe testified that his investigation revealed Honoré was not the driver but, instead, was the rear passenger. As such, after a three-month investigation, Detective Forsythe realized that Officer Roach made a mistake. He explained that Officer Roach’s identification of Honoré did not fit with what multiple witnesses had advised him in taped statements.
 

 Officer Roach testified that, on January 11, 2005, Detective Forsythe showed him a photographic lineup. From the lineup, Officer Roach identified Fisher as the driver of the vehicle he stopped. Officer Roach testified that he made a mistake in identifying Honoré as the driver. He testified that Honoré was the rear passenger who had tried to get out of the vehicle. Officer Roach also admitted that he made a mistake as to the identification of James as the passenger exiting the vehicle, when he was really the front passenger who stuck his head out while looking back at Officer Roach.
 

 Clifton Coston (“Mr. Coston”), an eyewitness to the shooting, identified Honoré as the shooter. Mr. Coston, who identified Honoré in a photographic lineup on November 24, 2004, knew him from before the incident. Mr. Coston also knew the victim and Rory Hebert (“Mr. Hebert”) from work in the daytime. (It appears that Mr. Hebert was a witness to the shooting.) Mr. Coston also had a job at night working at the club in security as a bouncer and had been working there for about three months at the time of the shooting.
 

 Mr. Coston testified that, on November 18, 2004, he saw the victim and Mr. Hebert together at the club where he was working. Mr. Coston testified that Honoré was also in the club and appeared upset after a woman posed for a photograph with the victim. According to Mr. Coston, Honoré walked off and kept “eyeing [the victim] down.”
 

 |f;According to Mr. Coston, the victim later walked out of the club, and Mr. Hebert went to tell Mr. Coston that he and the victim were about to leave. Minutes later, Mr. Coston followed a female out of the club. He testified that he saw a white Grand Prix down the street and that there was a person, who was later identified as the victim, bent over and leaning into the car talking to someone. He stated that a small car that was grey, tan, or brown, pulled up behind the Grand Prix, and that Honoré got out of the driver’s side, walked behind the car and around to the victim, and shot the victim while the victim was still bent over. He testified that the victim fell and the shooter stood over him and shot a couple of more times. He said that the shooter jumped into the passenger’s side of the car and they “kited.” He did not know if the shooter got into the front or back seat of the car, but the person on the passenger’s side moved over and got into the driver’s seat. He also testified that he did not see anyone else getting out of or getting into that car besides Honoré. Mr. Coston testified that the car went
 
 *490
 
 across the railroad tracks toward Airline Highway and then he saw police lights down the street coming toward the club but noticed that they stopped. He stated that police arrived a couple of minutes later.
 

 Gerald Lee (“Mr. Lee”), a taxicab driver, was working at the time of the incident and was parked facing the club, waiting for a customer. Mr. Lee testified that he heard the first shot, and then turned and saw the second shot from approximately twelve to fifteen feet away. He stated that the shooting occurred in the street and the cab’s windows were down, which allowed him to hear the shooter call the victim a “bitch” after the first shot. He said the shooter shot the victim from behind and then, as he fell, the shooter stood over the victim with his gun pointed down. He testified that, after the shooting, the shooter got into the rear passenger side of the car, and they drove away, speeding over the tracks and
 
 going
 
 |7toward Airline Highway. Mr. Lee testified that a Kenner police officer got behind the car and put his lights on. He described the car as a 2003 or 2004 compact car that was lavender or purplish in color. Mr. Lee testified that he did not see the shooter’s face, and he was not able to make identification.
 

 Four casings were recovered from the murder scene. Officer Jeff Adams of the Kenner Police Department found a weapon and its magazine at the intersection of Airline Highway and Waldo Street, a relatively short distance from the roadway. He went to that location because the vehicle that was identified as carrying the shooter had been stopped in the area, and it was believed that it could have been thrown there. The weapon was a Makarov brand semi-automatic handgun.
 

 Captain Timothy Scanlan (“Captain Scanlan”), an expert in the field of firearms and tool mark identification, examined the Makarov. He tested and compared the firing of the weapon to the casings that were recovered from the scene and concluded that, with 100 percent scientific certainty, he could say the casings were fired from the weapon.
 

 A black T-shirt, brown shoes, and white socks were found on the side of the street in the 700 block of Taylor Street. Officer Roach testified that he did not see anything being thrown out the vehicle he stopped. However, he acknowledged that it was dark, and he was trying to catch up with the vehicle.
 

 Defense witness Shantell Steadman (“Ms. Steadman”) testified that she was at Robinson’s Bar when the shooting occurred. She testified that she had met Honoré that night, and the two of them planned to go home together. She stated that she was with Honoré when she first heard the gunshots and that he did not have a gun in his hands nor did he fire any shots. She stated that, when they heard the gunshots, she ran toward the bar, while Honoré ran toward the tracks. Ms. | ^Steadman was approximately ten feet away from the shooting, but she did not see the shooting.
 

 Honoré testified, stating that he was about ten to thirteen feet away from the victim when he was shot. He did not see the shooting, and he denied shooting anyone. Honoré explained that he had given Fisher the keys to the car, which belonged to his girlfriend, because he planned to leave with Ms. Steadman. However, he said that, when he ran to the car after the shooting, no one was in the driver’s seat. He testified that he got into the driver’s seat and drove the car as they left the club. He testified that Fisher was sitting in the rear passenger seat of the car.
 

 Honoré stated that he saw Fisher pull off his black shirt to wipe off a gun when a
 
 *491
 
 police car was behind them. He said Fisher threw the gun out of the car and that the car was pulled over by Officer Roach. Honoré testified that he did not know Mr. Coston. He admitted that he went to the club every Thursday night, but had never seen Mr. Coston there. He also testified that he did not know the victim, had never met him, and had not seen him in the club that night.
 

 SUFFICIENCY OF THE EVIDENCE
 

 Honoré argues the evidence was insufficient to support his conviction because of the discrepancies and inconsistencies in the identifications and descriptions of the shooter. He contends there was no physical evidence linking him to the murder and concludes that the State did not prove beyond a reasonable doubt that a misidentification had not occurred.
 

 Under La. R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict | flgreat bodily harm.
 
 [1]
 
 Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the defendant’s conduct.
 
 [2]
 
 The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill.
 
 [3]
 
 Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson
 
 [4]
 
 standard.
 
 [5]
 

 In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the defendant’s identity as the perpetrator. When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State must negate any reasonable probability of misidentification.
 
 [6]
 
 Positive identification by one witness is sufficient to support a conviction.
 
 [7]
 

 Honoré does not claim that the State failed to prove any of the elements of second degree murder; rather, he argues he was not the perpetrator of the offense and that the State failed to prove that a misidentification had not occurred. From his testimony, it appears Honore’s theory was that Fisher was the shooter.
 

 |inHonore argues there was no physical evidence linking him to the murder. Ballistics testimony showed that the four casings found at the scene of the murder were
 
 *492
 
 fired from the gun found on the side of the road where Officer Roach stopped the vehicle. Sergeant Alan Abadie (“Sergeant Abadie”), a fingerprint expert, testified that he was not able to get usable fingerprints off of the murder weapon or the magazine. Although the vehicle, which belonged to Honore’s girlfriend, Velina Harris, was dusted for fingerprints, Sergeant Abadie was unable to get usable fingerprints from the vehicle’s interior. One fingerprint on the rear bumper of the vehicle matched that of Honoré. Sergeant Abadie discussed the problems with lifting fingerprints on surfaces such as guns and the interior of vehicles.
 

 There was no blood found on any items examined by Christine Kogos, a forensic scientist for the Jefferson Parish Sheriffs Office crime lab. Further, there were no interpretable DNA results from the shirt and socks tested. Captain Scanlan, an expert in the field of blood stain pattern analysis, testified that there was no blood found on the clothing Honoré was wearing. However, he also testified that studies showed that blood spatter would not be found in a hypothetical situation where the victim was shot in the head from a distance of greater than four feet.
 

 The testimony of the eyewitness to the murder was strong. Days after the murder, Mr. Coston identified Honoré as the shooter in a photographic lineup. He testified that there was no doubt as to what he saw that night. Mr. Coston testified that he saw the shooting, that the lighting was good, and that Honoré, whom he previously knew, was the shooter. He said that Honoré came to the club every Thursday and that they had “got into it” previously and “had words” because Honoré did not like taking his cap off in the club, which was a club rule. He also stated that he “got into it” with Honoré the night the victim was killed.
 

 _|v¡Mr. Coston was pi*esented with some inconsistencies between his testimony and his previous statement. Although at trial Mr. Coston said that he did not “duck” after the shooting, he was provided with an earlier statement in which he said that he ducked. The taped statement was played for the jury. He explained that he did not duck, but had gotten behind a “Tahoe.” Mr. Coston testified that he realized Honoré was the shooter when he shot the victim and said he knew Honore’s hair and face.
 

 Mr. Coston described the shooter to the police as having “dreads” and a cap, but he could not remember his clothing. He testified that Honoré did not have long hair, but had short dreads. However, in his previous statement, Mr. Coston said the shooter’s hair went down to his shoulders. Mr. Coston said the prior statement was not true because Honoré did not have long hair to his shoulders at the time.
 

 There was another discrepancy regarding Honore’s identity that Mr. Coston clarified at trial. Mr. Coston explained that, when he responded negatively when the police asked him about whether the shooter had “gold,” he believed they were talking about the gold on Honore’s body, not the gold in Honore’s mouth. He agreed that Honoré did have gold teeth.
 

 Mr. Coston explained that he did not wait to talk to the police after the shooting because he was not in the “right stage of mind.” He also stated the following, “I knew what type of people that I was dealing with.” Mr. Coston further stated that he did not talk to the police because he felt like it was his fault the victim died. He testified that the police contacted him later.
 

 Forensic findings corroborated Mr. Co-ston’s testimony that the victim was bent over at the time of the shooting. Dr.
 
 *493
 
 Susan M. Garcia (“Dr. Garcia”), an expert in the field of forensic pathology, performed the autopsy on the victim and testified that she believed one of the projectiles entered the left side of the victim’s | |2head. Dr. Garcia concluded that the wounds were distance-range wounds, which were beyond approximately three feet, depending on the weapon and ammunition used. She believed the weapon was discharged from the left side of the victim for three of the wounds, but the weapon was discharged in the front of the victim’s leg for the other. She described the head wound as being consistent with the victim being in a “bent over” position.
 

 Evidence was presented linking Honoré to the area in which the shooting occurred. Honoré admitted to being at the club after he was stopped by the Crescent City Connection Police Department. Further, cell phone records showed that the subscriber for Honore’s cell phone was his girlfriend and that, prior to the murder, several calls on that phone were made and received that were routed through a tower on Airline Drive, which Detective Forsythe testified was approximately nine-tenths of a mile from the club on Taylor Street.
 

 The theory of the defense at trial was misidentification. To attack Mr. Coston’s testimony, the defense presented the testimony of an expert to show that Mr. Coston was further in distance than he indicated. Keith Lobrono (“Mr. Lobrono”), an expert investigator, testified that he went to the 500 block of Taylor Street in Kenner and took measurements of where Mr. Coston and Mr. Lee were when they witnessed the shooting. He testified that he believed Mr. Lee’s description of the distance he was from the shooting, twelve to fifteen feet, was accurate. However, he stated that Mr. Coston was 175 feet from the shooting, instead of fifty-three and one-half feet as was indicated in the courtroom.
 

 Much of the misidentification theory depended on witnesses’ descriptions of the shooter’s hair and clothing. In connection with this, the identity of the person in the rear passenger seat became significant. Mr. Coston and Mr. Lee testified that the shooter got into the passenger seat of the vehicle. Mr. Coston was not sure |13if it was the front or rear passenger side, but Mr. Lee testified that it was the rear passenger seat.
 

 In support of his claim of misidentification, Honoré argues he was the driver of the vehicle and that Fisher was the rear passenger and the shooter. Honoré testified that, on the night of the murder, Fisher was wearing a black T-shirt and jeans, and that he was wearing khaki pants, a khaki shirt, and a yellow T-shirt.
 

 Officer Roach initially identified Honoré as the driver of the vehicle and James as the rear passenger who was trying to exit the vehicle after the suspect car was stopped by the Crescent City Connection Police Department. However, on January 11, 2005, after viewing a photographic lineup, Officer Roach picked out Fisher as the driver of the vehicle at the time of the Airline Highway stop. At trial, Officer Roach testified that he made a mistake in identifying Honoré as the driver and, rather, Honoré was the rear passenger trying to get out of the vehicle. Officer Roach also admitted that he made a mistake as to the identification of James and that he was really the front passenger who stuck his head out while looking back at Officer Roach. Officer Roach explained that he “zeroed in” on Honoré as the driver because Fisher and Honoré both had dread locks and resembled each other. He stated that everyone was moving and that his eyes were going back and forth trying to watch everybody in the vehicle. He did not see Fisher at the gas station but testi
 
 *494
 
 fied that, when presented with the lineup, he recognized Fisher as the driver.
 

 At the murder scene, Officer Roach gave Detective Forsythe a description of the di'iver he stopped, as well as the two subjects trying to exit. Officer Roach told Detective Forsythe the driver was wearing dark clothing and khaki pants and had long dread locks. He described the passenger in the rear, who was trying to exit, as having medium dread locks. Officer Roach explained at trial that long dread locks 114were braids about shoulder length and that medium dread locks were braids about halfway to shoulder length. He testified that that the driver, Fisher, had the longer dread locks.
 

 Officer Roach explained that when he later put Honoré as the driver in the report, it was because of his previous identification in the Crescent City Connection stop. In the written report, Officer Roach described the driver as wearing a black shirt and light pants, with medium dread locks. No description of the second black male, who tried to exit the rear seat, was put in the report. At trial, Officer Roach recalled the driver saying his name was Fisher, but he did not put that in his report because he had no identification or driver’s license to prove Fisher was his correct name. However, Detective For-sythe put in his report, and also testified, that Officer Roach told him the driver stated his name was Fisher. Detective Forsythe testified that, based on his investigation, Fisher was the driver of the vehicle at the time of the shooting. Detective Forsythe testified that Fisher was charged with accessory after the fact in this matter, and he believed Fisher was deceased at the time of trial.
 

 Although he was positive that Honoré was the shooter, Mr. Coston did not remember clothing he wore. Though he could not identify the shooter, Mr. Lee provided information regarding the shooter’s description. According to his testimony, he was clear when he told the police he was uncertain about some details of the shooter’s physical description, hairstyle, and clothing.
 

 Mr. Lee was shown his statement and acknowledged that he had said the shooter had corn rows past his ears “maybe shoulder length hair.” Mr. Lee recalled telling the police that he did not pay attention to the shooter’s clothing and while he said the shooter “maybe” wore a black T-shirt on top of a white T-shirt and dark jeans, he pointed out that he used the word “maybe” three times. Mr. Lee Instated that he thought he paid attention to what the shooter was wearing, but stated, “But, you know, maybe through all the chaos I probably saw somebody else after that and I told the officer he probably had on a black shirt with white underneath.”
 

 Mr. Lee testified that he made it clear to the officer that he was not certain, but gave him the best physical description that he could. While he admitted that he may have been wrong about the shooter’s clothing description, he was adamant that he was certain about where the shooter got into the car, and he emphasized that the only thing he
 
 was
 
 certain about was that the shooter got into the rear passenger side of the car. Officer Mark Stein of the Kenner Police Department testified that he recalled writing in his report that the shooter was wearing a black shirt, but the potential clothing description of the shooter came from an officer who had interviewed Mr. Lee.
 

 Detective Forsythe testified that, according to witnesses, Honoré was wearing a yellow shirt and khaki pants at the club, and he was wearing this clothing when stopped by Officer Roach and by the Crescent City Connection police. Detective Forsythe testified that he investigated this
 
 *495
 
 case and believed that the right person was arrested for the murder. When Hon-oré was stopped at the gas station, he was wearing a yellow T-shirt underneath a tan-colored Dickies button-down shirt and matching Dickies long pants.
 

 Honoré and the woman he met on the night of the shooting presented a different version of the events. Ms. Steadman stated that she had met Honoré that night, and they had planned to go home together. She testified that she was with him when the shooting occurred and, at that time, he was wearing a yellow shirt with a symbol, a khaki long-sleeved Dickies shirt and khaki pants. She never saw him wearing a black T-shirt. Ms. Steadman stated that she had spoken with defense counsel approximately one week before trial, and she explained that she | ,r>did not go to the police or to the district attorney because she did not know who was handling the case.
 

 Honoré testified that when he left the club he was driving and Fisher was sitting in the rear-passenger seat, wearing a black T-shirt and blue jeans. He testified that Fisher pulled off his black shirt to wipe the gun and threw the gun out of the car when Officer Roach pulled behind them. Honoré denied that anyone gave Officer Roach the name Fisher in his presence.
 

 Although Mr. Coston stated that he knew Honoré and had seen him in the club, and that they had previously “had words,” Honoré stated that he did not know Mr. Coston and had never seen him before. He stated that he went to the club every Thursday night, but he had never seen Mr. Coston at the club before. He denied that they previously had problems with each other. Although Mr. Coston testified that he saw Honoré “eyeing” down the victim after the photograph he took with a woman, Honoré denied ever seeing the victim. Honore’s testimony partially conflicted with what he told the police after being stopped by the Crescent City Connection Police Department. Although Honoré had denied that police had stopped him earlier, at trial he admitted that he was stopped by Officer Roach.
 

 Other evidence was presented from which the jury could have inferred that Honoré was linked to the murder. Five $100 bills were found underneath the seat of the police unit where he had been detained although he denied putting money there. When the $500 is added to the $740 found hidden underneath the insole of James’ shoe, the total amount of hidden money recovered is $1240. This amount is significant.
 

 Wanda Jacobs, the victim’s mother, testified that her son got paid on November 18, 2004, and he made between $1200 and $1300 per week. She testified that, when she received her son’s belongings from the coroner’s office, he |17only had about $28. Similarly, Detective Forsythe testified that the victim had $30 and some change on him. He agreed that no witnesses said they saw the shooter take anything from the victim but explained that several witnesses said they ran and ducked behind cars when they heard the gunshots. Mr. Lee said that he did not see the shooter attempt to take anything from the victim but that he had ducked down. Mr. Coston testified that he did not see anyone take anything from the victim, but he stated that people scattered and were blocking his view once the shooting began. Mr. Coston testified that he knew the victim had money because he was paid on that day and could have had $1500 or $2000 on him. He testified, however, that he did not see the victim with the money in the club.
 

 When presented with all the evidence, the jury could have reasonably determined that Honoré was the shooter. The jury
 
 *496
 
 was presented with all of the evidence and was made fully aware of the inconsistencies within some witnesses’ descriptions. Honoré was positively identified by Mr. Coston. The jurors clearly found the State’s witnesses more credible than the testimony of Honoré and his witnesses, and it is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence.
 
 [8]
 
 The jury rejected Honore’s theory of mistaken identity, and the evidence, viewed in a light most favorable to the State, was sufficient to establish that Honoré was the individual who murdered the victim. This assignment of error is without merit.
 

 DENIAL OF MOTION TO SUPPRESS
 

 Honoré argues that the identifications made of him are unreliable and should be suppressed, claiming the photographic lineups were unduly suggestive because his photograph was the only photograph depicting a person wearing prison garb. He also argues that the witnesses did not describe any distinguishing features that hacould have separated him from other black males, and instead gave generic descriptions. He concludes that the State cannot negate the probability of misidentification, particularly in light of the subsequent testimony and the assignments of error.
 

 At the suppression hearing, Detective Forsythe testified that photographic lineups, including Honore’s photograph, were compiled and were shown to potential witnesses. Detective Forsythe stated that Mr. Hebert and Mr. Coston identified Honoré as the shooter from photographic lineups, and that they were not forced, coerced, or threatened, or promised anything of value in exchange for making the identifications. He also testified that he did not suggest to them which photograph to select.
 

 Detective Forsythe testified that Mr. Hebert had previously given him a statement that he had observed the shooting and, therefore, the detective handed the lineup to Mr. Hebert and asked him to view all six photographs in the lineup and determine if he recognized the shooter. Detective Forsythe stated that he did not tell Mr. Hebert the shooter was in the lineup, and he also denied that he suggested to Mr. Hebert which photograph to select. He testified that Mr. Hebert identified Honoré as the shooter and that he signed and dated the rear of the photograph which depicted Honoré. According to Detective Forsythe, Mr. Hebert had not previously known Honoré. On cross-examination, Detective Forsythe was questioned about the photographic lineup shown to Mr. Hebert. Detective Forsythe testified that Honoré was wearing an orange shirt and that there might be one other person in that lineup wearing orange clothing.
 

 Detective Forsythe testified that Mr. Coston, a bouncer at the club, had witnessed the shooting. He further stated that Mr. Coston recognized Honoré as someone he saw in the club regularly for the past several months and also | ^identified him as the shooter. Detective Forsythe said that Mr. Coston stated that he saw Honoré get out of the car, walk up to the victim, shoot the victim, and then get back into the car. Several other witnesses identified Honoré as having been at the club the night of the shooting or as someone who frequented the club.
 

 At the hearing, Honoré challenged a photographic lineup that was used. He
 
 *497
 
 argued he was the only one “clearly wearing an orange prison suit,” that it was “common knowledge” that in Jefferson Parish inmates wear orange, and that this alone rendered the identification suggestive. Honoré also argued that he had distinctive characteristics, such as his gold teeth. He further alleged that the people in the club likely talked about the incident prior to viewing the lineups and the people who did identify him as the shooter had an interest in the case because they were involved.
 

 In order to suppress an identification, a defendant must first prove the identification procedure was suggestive. If, during the procedure, the witness’ attention is unduly focused on the defendant, the identification procedure is suggestive.
 
 [9]
 
 Even when the suggestiveness of the identification process is proven by the defendant or presumed by the court, the defendant must also show there was a substantial likelihood of misidentification as a result of the identification procedure.
 
 [10]
 
 Under
 
 Manson v. Brathwaite,
 

 [11]
 

 the factors that courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentifi-cation include: the witness’ opportunity to view the criminal at the time of the crime, the witness’ degree of attention, the accuracy of the prior description of the criminal, the level of certainty 12qdemonstrated at the confrontation, and the time between the crime and the confrontation.
 
 [12]
 

 In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification.
 
 [13]
 
 A trial court’s determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion.
 
 [14]
 

 The photographic lineups were not formally introduced into evidence at the Motion to Suppress, but the lineup shown to Mr. Coston does appear as a trial exhibit. In the lineup shown to Mr. Coston, Honoré is the only person wearing an orange shirt, although it appears to be a collared shirt. However, at trial Mr. Coston testified that he did not have to see a photograph of Honoré to identify him because he knew him.
 

 We do not have benefit in the record of the lineup shown to Mr. Hebert. Appellate courts have no authority to receive or review evidence not contained in the trial'court record.
 
 [15]
 
 However, based on the suppression hearing, the testimony suggests that Honoré was not the only person in the lineup wearing orange. Moreover, even if the lineup shown to Mr. Hebert was the same one shown to Mr. Coston, it was not established that the clothing worn by Honoré was actually prison garb. Mr. Hebert and Mr. Coston, who identified Honoré as the shooter after viewing the photographic lineups, were not witnesses at the suppression hearing and were not asked if the orange-colored cloth
 
 *498
 
 ing drew their attention to Honore’s photograph. Although Mr. Hebert stated he did not know Honoré, Mr. |⅞, Coston did know him. Finally, none of the photographs depict a person with gold teeth. None of the other witnesses identified Honoré as the shooter.
 

 Considering the foregoing, Hon-oré did not prove the identifications were suggestive. Further, even if the photographic lineup identifications were suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure.
 

 At the suppression hearing, Detective Forsythe testified that Mr. Hebert had previously given him a statement that he had observed the shooting. Detective Forsythe stated that he showed Mr. Hebert the lineup maybe a week or so after the shooting. The incident happened on the streets, and there were “normal” street lights. Further, Mr. Hebert’s identification of Honoré as the shooter was made in close proximity to the shooting. According to Detective Forsythe, Mr. Hebert was between the curb and the sidewalk and that the shooting took place “just on Rory’s [Hebert] side of the middle of the street.”
 

 Mr. Coston had an opportunity to view the shooter because he was an eyewitness. At the hearing, Detective Forsythe recalled that he was several car lengths away. Detective Forsythe stated, at the suppression hearing, that Mr. Coston identified Honoré as the shooter and recognized him as someone he saw in the club regularly for the past several months. The level of certainty of the identification was demonstrated by Mr. Coston knowing Honoré prior to the identification. Further, Mr. Coston described the incident with attention to detail.
 

 Based on the foregoing, even if the lineups had been suggestive, there was no substantial likelihood of misidentification. We find no abuse of discretion by the trial court in denying Honore’s Motion to Suppress.
 

 J^HEARSAY EVIDENCEIMISTRIAL/NEW TRIAL
 

 Honoré argues that the trial court erred by not granting him a mistrial when a statement by Mr. Hebert, an unavailable witness, was allowed into evidence and, when Mr. Lobrono, a defense investigator, was improperly questioned by the prosecution as to whether he had expressed to them an opinion regarding Honore’s guilt or innocence.
 

 Since mistrial is a drastic remedy, in instances where it is not mandatory, this relief is warranted only when the defendant suffers substantial prejudice that deprived him of any reasonable expectation of a fair trial.
 
 [16]
 
 The decision to grant or deny a mistrial is within the trial court’s sound discretion. The denial of a motion for mistrial will not be disturbed on appeal absent an abuse of'that discretion.
 
 [17]
 

 Mr. Lobrono’s Testimony
 

 Following his testimony on direct, Mr. Lobrono stated on cross-examination that he was asked to speak to several witnesses but was unable to do so. At that point, the prosecutor asked if Mr. Lobrono had a conversation with her outside in the hallway, and Mr. Lobrono answered affirmatively. The State then asked about the conversation, and Mr. Lobrono said that the conversation concerned the fact that the prosecutor’s assistant knew him and
 
 *499
 
 that the prosecutor knew his sister. The State then asked, “And did you not tell me outside that after you conducted your investigation in this case you believed that the State’s case was correct and the defendant was the shooter?” Mr. Lobrono stated that he did not recall saying that to the prosecutor. He also denied stating that he had spoken to Honore’s friends, who were at the scene at the time of the shooting, and denied saying ^anything in reference to Honoré being the shooter. At no point during this testimony did Honoré object to the line of questioning by the State. On re-direct by the defense, Mr. Lobrono denied telling the prosecutor “anything about Mr. Honoré of his guilt or innocence.”
 

 After several other witnesses were called and after a lunch recess, Honoré recalled Mr. Lobrono. The court allowed Mr. Lobrono to be recalled, “as long as the State can cross-examine him again.”
 

 Defense counsel questioned Mr. Lobro-no about the extent of his involvement in the case. Mr. Lobrono testified that he did not interview witnesses or review defense counsel’s file. Defense counsel then asked Mr. Lobrono if he could come to a conclusion that Honoré was guilty, to which question Mr. Lobrono responded that he could not, and that was for the jury to decide. Defense counsel then asked if he would reach a conclusion about someone’s guilt without at least looking at the file or listening to witnesses. Mr. Lobrono stated that he could not draw any conclusions in the case and would not attempt to do so. He testified that he was not given inside information as to Honore’s guilt or innocence. When questioned by defense counsel and the State, Mr. Lobrono again denied discussing Honore’s guilt or innocence with the prosecutor or any one else. On cross-examination, the State asked whether Mr. Lobrono stated in the hall that the State had the “right guy.” Mr. Lobrono testified that he told the prosecutor that he was not sure whether the State had the “right man” and denied saying the State had the “right guy.” Again, there were no objections by Honoré.
 

 The State then called Norman Schultz (“Mr. Schultz”) and Assistant District Attorney Elizabeth Curren (“Ms. Curren”) as witnesses. Mr. Schultz, an investigator with the Jefferson Parish District Attorney’s Office, testified that he recalled the interaction between the prosecutor, Ms. Curren, Mr. Lobrono, and |2,[himself. He testified that Mr. Lobrono approached them in the hallway at approximately 9:15 or 9:30 and said to the prosecutor that he believed the prosecutor “had the right person on trial and that Mr. Regan’s witnesses either weren’t ... cooperative or weren’t telling him what he wanted to hear.”
 

 Ms. Curren testified that she knew Mr. Lobrono’s sister. She testified that there was a conversation in the hallway that morning involving Mr. Lobrono, the prosecutor, Mr. Schultz, and herself. She said that Mr. Lobrono stated that “[y]ou all have the right guy.” On cross-examination, Ms. Curren agreed that there were some problems with the case. There was no defense objection at any time during the testimony of Mr. Schultz and Ms. Cur-ren.
 

 Outside the presence of the jury, Hon-oré argued that Mr. Lobrono was hired with the defense team and now the jury would think even his investigator thought he was guilty. Honoré moved for a mistrial, arguing that nothing could be more damaging and that Honoré could not get a fair trial. The court noted that defense counsel did not object to the questioning. The court determined that the substance of Mr. Lobrono’s testimony was that he took measurements and tried to find some witnesses and, in denying the motion for
 
 *500
 
 mistrial, explained that the final decision was for the jury. Defense counsel then argued that the attorney-client privilege had been violated because Mr. Lobrono commented on the guilt of Honoré in the hallway. The State argued that Mr. Lo-brono was qualified as an expert witness, and, therefore, it was allowed to talk to the expert witness. The prosecutor argued that Mr. Lobrono went to her and that there was no attorney-client privilege violation.
 

 After a recess, the trial judge found the following:
 

 During the recess the Court has had the opportunity to review Article 506 dealing with the lawyer-client privilege and more particularly Section “B” which deals with the general rules of 12sprivilege which states: “A client has a privilege to refuse to disclose or to prevent another person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client.” In listening to the transcript the DA investigator from Division “A”, Norman Schultz, said that what Mr. Lobrono— Mr. Keith Lobrono had done was express his opinion that the DA had the right guy and witnesses were not saying what the defense wanted to hear. The Court is of the opinion that that is not privileged communication since whatever witnesses were saying the DA had a right to interview all witnesses in the case, so what witnesses are saying in the case is really not privileged communications.
 

 Also, the Court does not — under Article 775 the Court does not believe that the prejudicial- — alleged prejudicial conduct outside the courtroom would make it impossible for the defendant to obtain a fair trial in this case because the Court allowed defense counsel the opportunity to recall his investigator, Mr. Lobrono, and also to elicit testimony that he had not spoken to any witnesses and all he did was try to locate witnesses and make measurements in the case. So I think really giving his opinion in the case just goes to the weight of the evidence, and the jurors are in a position after hearing all the testimony and making a decision of what weight to give to that like other things — other evidence that has come in during the trial, so the Court is going to go ahead and deny the Motion for a Mistrial.
 

 Defendant objected and requested an instruction, which the trial court granted. The court gave the following instruction to the jury:
 

 Members of the Jury, I need to instruct you as regards to the testimony of Mr. Keith Lobrono, Elizabeth Curren and Norman Schultz regarding any opinion allegedly expressed by Mr. Keith Lobrono as to the guilt or innocence of the defendant Steven Honoré.
 

 Both the State and the defense has [sic] experienced problems in locating and getting witnesses to cooperate in this case.
 

 Mr. Lobrono has testified as to his limited amount of work on this case to include only taking measurements at the scene and to locating trial witnesses. He testified that he did not locate any witnesses and did not interview any witnesses, nor has he reviewed any reports, witness statements or materials involved in this case. His opinion as to the guilt or innocence — his opinion as to the guilt or the innocence of the defendant in this matter should not be considered by you in any manner during your deliberations. Okay?
 

 After trial, there was a hearing on Hon-ore’s motion for new trial. Honoré argued that the State’s argument that Mr. Lobro-
 
 *501
 
 no could give an opinion because |2nhe was qualified as an expert, in fact, made things worse and that he (Honoré) did not have knowledge of the conversation until it came out. Honoré argued there were issues of reasonable doubt until this happened and requested a new trial, arguing he was denied due process and that this affected the outcome of the case.
 

 The court found that the State called Mr. Lobrono for impeachment, and not for purposes of giving an opinion regarding Honore’s guilt or innocence. The judge stated that he believed there was ample evidence at trial supporting the guilty verdict and denied the motion for new trial. Honoré objected and again reiterated his position before sentencing.
 

 There was no objection by the defense during or after the cross-examination of Mr. Lobrono. Following that cross-examination, the defense then called several other defense witnesses. After a lunch recess, Honoré recalled Mr. Lobrono. He did not object or move for a mistrial until after the State called Mr. Schultz and Ms. Curren as witnesses to rebut Mr. Lobro-no’s testimony. Under these circumstances, Honoré has waived any error regarding the State’s line of questioning to impeach Mr. Lobrono by his failure to move timely for a mistrial or to enter a contemporaneous objection. See, La. C.Cr.P. art. 841(A).
 

 Notwithstanding that finding, and considering the merits of the issue, we underscore that the State’s questioning of Mr. Lobrono was on cross-examination. Under the Louisiana Code of Evidence “a witness may be cross-examined on any matter relevant to any issue in the case, including credibility.” La. C.E. art. 611(B). Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner I^has traditionally been allowed to impeach, or discredit, the witness.
 
 [18]
 
 The ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the court’s broad discretion.
 
 [19]
 
 Mr. Lobrono, who was asked to take measurements and talk to witnesses, denied having talked to witnesses in the case, and the State’s line of questioning was for impeachment purposes. When the defense recalled Mr. Lo-brono and questioned him regarding the conversation, it opened the door to the subsequent line of questioning by the State. Under these circumstances, the scope of cross-examination was within permissible limits.
 

 With regard to the issue of attorney-client privilege, Mr. Lobrono’s out-of-court statement was not a privileged or confidential communication protected by La. C.E. art. 506. Even had the defense preserved this claim for review, and even if there was error, it is harmless. Had a mistrial been warranted, the failure to grant a mistrial would not result in an automatic reversal of defendant’s conviction, but would be a trial error subject to the harmless error analysis on appeal.
 
 [20]
 
 Trial error is harmless where the verdict rendered is “surely unattributable to the error.”
 
 [21]
 

 
 *502
 
 In the present case, Mr. Lobrono denied commenting on Honore’s guilt. Even when recalled, he testified that he did not interview witnesses or review defense counsel’s file and that he was not given inside information as to Honore’s guilt or innocence. He further denied saying that the State had the “right guy.” Further, Honoré requested an instruction by the court to the jury regarding Mr. Lobrono’s testimony, which was drafted by and read to the jury.
 

 laaAs we determined in our sufficiency analysis, the jury was presented with sufficient evidence supporting Honore’s guilt and, thus, the guilty verdict was surely unattributable to any alleged such error. Honoré did not suffer substantial prejudice that deprived him of any reasonable expectation of a fair trial. For the above reasons, we do not find that the trial court abused its discretion in denying the motion for mistrial.
 

 Mr. Hebert
 

 Honoré contends that inadmissible hearsay by Mr. Hebert was introduced during Detective Forsythe’s testimony. Honoré argues that the jury could not weigh Mr. Hebert’s credibility and judge his demeanor because he did not testify at trial, and this error cannot be deemed harmless.
 

 Detective Forsythe testified on direct examination that Detective Stromeyer interviewed Mr. Hebert and took a taped statement from him on the morning of the 19th. Detective Forsythe took a statement from him on the 23rd, but explained that the tape recorder malfunctioned at the time of Mr. Hebert’s second statement.
 

 Detective Forsythe was asked on cross-examination by defense counsel about the closest witness to the shooting. Detective Forsythe responded that it was Mr. Hebert. Thereafter, on re-direct examination, the State asked if Mr. Hebert was the closest to the shooting and if he had spoken to Mr. Hebert. Detective Forsythe responded affirmatively. Subsequently, the State asked, “Was the description of the shooter’s clothing — ” and defense counsel objected to the testimony as hearsay. The State explained that it intended to ask the detective whether the clothing description he received from Mr. Hebert “went towards ultimately who he arrested and why he took a particular step in his investigation.” Defense counsel argued that he had not opened the door as to anything Mr. Hebert |29had said. The court agreed the testimony was based on hearsay that Honoré could not cross-examine.
 

 On rebuttal, Detective Forsythe testified that his investigation revealed that Officer Roach had possibly made a mistake in identifying Honoré as the driver and asked the officer to view a photographic lineup. Defense counsel cross-examined Detective Forsythe and asked him if Honoré was wearing the [gold] shirt and khaki pants in the bar. Detective Forsythe testified that, according to witnesses, Honoré was wearing those clothes in the bar as well as at the time he was stopped by Officer Roach and by the Crescent City Connection officer. Defense counsel then asked the following: “And that certainly didn’t square with the black T-shirt of the shooter that got out of the driver’s side of the car and positively got into the passenger seat in the back, did it? You can’t be wearing a black T-shirt if you’re dressed like that, right?” Detective Forsythe commented that he would like to fully explain the answer to that question, but did not know if he could. The State asked the court if the detective could answer the question. The court said the witness could answer the question, as long as it did not involve hearsay. Detective Forsythe then said he had witnesses advising him that the shoot
 
 *503
 
 er was dressed in “those clothing,” i.e., the gold or yellow shirt and khaki pants and got into the back passenger seat.
 

 On re-direct examination, the State asked Detective Forsythe “what witness told you the shooter, the defendant, was wearing the outfit we have here in court?” Defense counsel interrupted and commented that he believed the court ruled on the hearsay, and the State responded that defense counsel had elicited hearsay regarding the description of Honore’s clothing on cross-examination. The State explained that it was following up to this line of questioning regarding who said 13nwhat Honoré was wearing. The court agreed with the State that hearsay had been elicited and overruled Honore’s objection.
 

 Thereafter, the State asked, “Detective, who told you that at the time the defendant shot Ernie Jacobs he was wearing those clothes?” Detective Forsythe responded, “Rory Hebert who was closest to the shooting ... of all the witnesses.” This was the last question by the State, and then the State offered its evidence into the record. The State then rested, subject to its right of rebuttal. The jury was dismissed.
 

 However, before the court recessed, Honoré objected to Detective Forsythe’s testimony regarding Mr. Hebert’s statement. He requested a mistrial and a new trial. Honoré argued that the statement was hearsay and that the witness was not there and had not been cross-examined. The trial court denied the motion for mistrial and motion for new trial, and Honoré noted his objection. The trial judge explained that he thought defense counsel asked on cross-examination how the witness came to the conclusion about the clothing, and the judge believed this opened the door. The judge stated that these conclusions could have only come through hearsay from witnesses the witness had talked to. Honoré argued that there was no objection by the State and then the State was able to say that an absent witness said he killed a man.
 

 La. C.E. arts. 801(A)(1) and 801(C) define hearsay as an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802. As a general rule, an investigative report prepared by police and other law enforcement personnel is excluded from the public records and reports exception to the hearsay rule.
 

 lsiln
 
 State v. Winfrey,
 

 [22]
 

 ,
 
 the defendant complained that the trial court improperly permitted the State to elicit testimony from a witness on re-direct examination that was beyond the scope of cross-examination and argued that the testimony was based on an inadmissible hearsay report. On cross-examination, the defense counsel had asked the witness questions and asked the witness to refer to the report to answer the question. The prosecutor then questioned the witness on redirect examination regarding the report.
 

 In that case, this Court found that the report from which the witness testified was hearsay and inadmissible. However, we further found the trial court did not err in allowing the testimony on re-direct because defense counsel opened the door for the inadmissible hearsay report by the questioning on cross-examination from the
 
 *504
 
 report. “ ‘Where defense counsel went on cross-examination, the State had the right to follow on redirect.’ Because defendant opened the door through interrogation, the defense cannot now be heard to complain.”
 
 [23]
 
 In the present case, as in
 
 Winfrey,
 
 although the report was hearsay and inadmissible, there was no error by the trial court in admitting this evidence.
 

 However, even assuming that there was error in the admission of this testimony, the ruling was clearly harmless. It has long been held that the admission of hearsay testimony is harmless error when the effect is merely cumulative or corroborative of other testimony adduced at trial.
 
 [24]
 
 Here, other witnesses testified as to what Honoré was wearing at the club and after-wards. The eyewitness, Mr. Coston, testified as to the identity of Honoré as the shooter as well as to his clothing. Additionally, the idea that Mr. Hebert was the closest witness toJjjthe shooting was elicited by defense counsel and presented to the jury prior to this testimony without objection.
 

 This assignment of error is without merit.
 

 ERROR PATENT REVIEW
 

 The commitment and transcript do not reflect that Honoré was advised of the prescriptive period in which to apply for post-conviction relief as required by La. C.Cr.P. art. 930.8. In the past, this Court has ordered the trial court to properly advise defendant of the prescriptive period under La.C.Cr.P. art. 930.8 by written notice within ten days of the rendition of this Court’s opinion and then to file written proof in the record that defendant received notice. However, we have more recently corrected this error by way of its opinion rather than on remand.
 
 [25]
 

 Accordingly, we advise Honoré by our opinion in this case that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. art. 914 or 922.
 

 For the reasons set forth herein, we affirm defendant’s conviction and sentence.
 

 AFFIRMED.
 

 [1]
 

 .
 
 See, State v. Lewis,
 
 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583,
 
 writ denied,
 
 06-0757 (La. 12/15/06), 944 So.2d 1277.
 

 [2]
 

 .
 
 See, State v. Graham,
 
 420 So.2d 1126 (La.1982);
 
 State v. Young,
 
 05-702 (La.App. 5 Cir. 2/14/06), 938 So.2d 90.
 

 [3]
 

 .
 
 State v. Gant,
 
 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099,
 
 writ denied,
 
 06-2529 (La.5/4/07), 956 So.2d 599.
 

 [4]
 

 .
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 [5]
 

 .
 
 State v. Spears,
 
 05-0964 (La.4/4/06), 929 So.2d 1219.
 

 [6]
 

 .
 
 State v. Draughn,
 
 05-1825 (La.1/17/07), 950 So.2d 583, 593,
 
 cert. denied,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
 

 [7]
 

 .
 
 See, State v. Harris,
 
 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187.
 

 [8]
 

 .
 
 State v. Theriot,
 
 07-71 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012,
 
 writ denied,
 
 07-1598 (La.2/1/08), 976 So.2d 715.
 

 [9]
 

 .
 
 State v. Higgins,
 
 03-1980 (La.4/1/05), 898 So.2d 1219, 1232,
 
 cert. denied,
 
 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
 

 [10]
 

 .
 
 Id.
 

 [11]
 

 . 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
 

 [12]
 

 .
 
 Higgins, supra.
 

 [13]
 

 .
 
 State
 
 v.
 
 Clennon,
 
 98-1370, p. 6 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164.
 

 [14]
 

 .
 
 Id.
 

 [15]
 

 .
 
 State v. Martinez,
 
 552 So.2d 1365, 1368 (La.App. 5 Cir.1989).
 

 [16]
 

 .
 
 State v. Lee,
 
 09-37 (La.App. 5 Cir. 5/12/09), 15 So.3d 229 (citing
 
 State v. Harris,
 
 00-3459, p. 9 (La.2/26/02), 812 So.2d 612, 617)).
 

 [17]
 

 .
 
 Id.
 

 [18]
 

 .
 
 State v. Draughn,
 
 05-1825 (La.1/17/07), 950 So.2d 583, 616,
 
 cert. denied,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
 

 [19]
 

 .
 
 Id.
 

 [20]
 

 .
 
 State v. Givens,
 
 99-3518 (La.01/17/01), 776 So.2d 443;
 
 State v. Johnson,
 
 94-1379 (La. 11/27/95), 664 So.2d 94.
 

 [21]
 

 .
 
 State v. Johnson, supra.
 

 [22]
 

 . 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 76,
 
 writ denied,
 
 98-0264 (La.6/19/98), 719 So.2d 481.
 

 [23]
 

 .
 
 Id.
 
 at 77 (citing
 
 State v. Overton,
 
 337 So.2d 1201, 1206 (La.1976);
 
 State v. Rideau, 249
 
 La. 1111, 193 So.2d 264, 269 (1966),
 
 cert. denied by Rideau v. Louisiana,
 
 389 U.S. 861, 88 S.Ct. 113, 19 L.Ed.2d 128 (1967);
 
 State v. Pratt,
 
 95-762 (La.App. 5 Cir. 2/27/96), 671 So.2d 21, 24).
 

 [24]
 

 .
 
 Slate v. Kennedy,
 
 05-1981 (La.5/22/07), 957 So.2d 757.
 

 [25]
 

 .
 
 See, State v. Davenport,
 
 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445.