STATE OF LOUISIANA

VERSUS

CHARLES MCQUARTER, III

NO. 19-KA-594

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 14,169, DIVISION "C"
HONORABLE J. STERLING SNOWDY, JUDGE PRESIDING

November 25, 2020

**ROBERT A. CHAISSON**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Robert A. Chaisson, and John J. Molaison, Jr.

**CONVICTION AND SENTENCE FOR SECOND DEGREE MURDER**
**VACATED; CONVICTION AND SENTENCE FOR ARMED ROBBERY**
**WITH A FIREARM AFFIRMED; REMANDED**
    **RAC**
    **FHW**
    **JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Bridget A. Dinvaut
    Justin B. LaCour

COUNSEL FOR DEFENDANT/APPELLANT,
CHARLES MCQUARTER, III
    Cynthia K. Meyer

**CHAISSON, J.**

Defendant, Charles McQuarter, III, appeals his convictions and sentences for second degree murder and armed robbery with a firearm. In his appellate brief, defendant challenges the sufficiency of the evidence used to convict him and the validity of the non-unanimous jury verdict on the second degree murder conviction. In addition, defendant contends that the trial court erred in denying his motions for change of venue and to suppress the identification and in allowing the testimony of a state expert witness without conducting a *Daubert*[1] hearing. For the reasons that follow, we affirm defendant's conviction and sentence for armed robbery with a firearm, vacate his conviction and sentence for second degree murder, and remand the matter for further proceedings in accordance with this opinion.

## PROCEDURAL HISTORY

On May 5, 2014, a St. John the Baptist Parish Grand Jury returned an indictment charging defendant with the first degree murder of Steven Finckbeiner, in violation of La. R.S. 14:30. Defendant pled not guilty at his arraignment. However, after a finding by the trial court that defendant suffers from mental retardation within the meaning of La. C.Cr.P. art. 905.5.1 and is therefore exempt from capital punishment, the State, on October 19, 2016, filed an amended indictment charging defendant with second degree murder, in violation of La. R.S. 14:30.1(A)(1) (count one), and armed robbery with a firearm, in violation of La. R.S. 14:64(A) and La. R.S. 14:64.3(A) (count two). Defendant was re-arraigned and pled not guilty.

Following the resolution of numerous pretrial motions,[2] trial began with jury selection on March 25, 2019, and concluded on March 28, 2019, with the jury

---

[1] *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[2] The motions relevant to this appeal will be addressed in the respective assignments of error.

finding defendant guilty of second degree murder by a vote of eleven to one and guilty of armed robbery with a firearm by a unanimous verdict.

On April 8, 2019, the State filed a multiple offender bill of information alleging defendant to be a second felony offender with respect to count two, armed robbery with a firearm. Following a hearing on May 30, 2019,[3] the trial court adjudicated defendant a second felony offender. The trial court then sentenced defendant to life imprisonment at hard labor for the second degree murder conviction and ninety-nine years imprisonment at hard labor for the armed robbery with a firearm conviction. The sentences were imposed without benefit of parole, probation, or suspension and were ordered to be served concurrently. Defendant now appeals.

### FACTS

This case stems from a murder and an armed robbery that occurred on the afternoon of February 25, 2014, at the LaPlace Feed Store, which was owned and operated by Mrs. Constance Finckbeiner and her husband, Mr. Steven Finckbeiner.

At trial, Mrs. Finckbeiner relayed the events that occurred on that day. She stated that as she was sewing in the back of the store, her husband, who was working outside, brought two black male customers into the store and asked her to assist them. Mrs. Finckbeiner went behind the counter by the cash register and spoke to the taller man about shots for his three-week-old puppy while the shorter man roamed around the store. She explained to the man at the counter that the dog was too young for shots but needed to be wormed. When he responded that he wanted the shots and did not want to worm the dog, Mr. Finckbeiner told him to come back in three weeks. Mrs. Finckbeiner described the man she was talking to at the counter as taller and thinner with a "short Afro," and the man who walked

---

[3] On this date, the trial court also heard and denied defendant's motions for post-verdict judgment of acquittal and new trial.

around the store as shorter and heavier with a "poofy hairdo." In addition, she stated that both men wore "really oversized clothes." The two men left the store together without making a purchase.

After they left, Mrs. Finckbeiner looked out the window on the front door and noticed the two men standing across the street. She mentioned this to her husband, who was at his desk in an office near the entrance to the store, and as she turned to walk away, a gun was placed to her temple, and the trigger was pulled. Mrs. Finckbeiner fell to the floor and heard another gunshot and a voice saying, "Where's the f'n money. I want the f'n money." Mrs. Finckbeiner believed that she lost consciousness at that point but regained it later when the cash register was thrown at her, and she again heard the perpetrator say, "I want the f'n money." The man then picked up something, later identified as the cash register, and left.

Mrs. Finckbeiner described that once she regained some movement in her legs and hands, she crawled to the door, locked it, pulled herself up from the ground, and saw the two men standing next to each other across the street. Mrs. Finckbeiner looked at her husband, who was hunched over and not moving, called one of her sons and 9-1-1,[4] and repeatedly pushed the store's panic button.

Deputy Michael Dean of the St. John the Baptist Parish Sheriff's Office was the first officer to arrive at the scene and found the door to the feed store locked. He announced himself and knocked loudly on the door. When the door opened, Deputy Dean observed a white female, later identified as Constance Finckbeiner, standing in front of him with a bullet hole to her face and asking him to help her husband. Deputy Dean looked into the office and observed a male victim, later

---

[4] Mrs. Finckbeiner did not remember calling 9-1-1, but she identified herself as the caller on a recording of the 9-1-1 call that was played for the jury.

identified as Steven Finckbeiner, on his knees, slumped forward, with no signs of life, and a pool of blood in front of him on the floor.[5]

In the meantime, Detective Anthony Goudia, the lead investigator, and other officers arrived, assessed and secured the scene, and assisted Mrs. Finckbeiner, who was able to give a brief description of the perpetrators prior to being transported to the hospital.[6]  The officers took photographs of the scene and collected evidence, including bullets and a portion of the cash register.[7]  They also located a trail of debris from the feed store, including business cards and paperwork, strewn along the route the offenders took.  In addition, the officers canvassed the area and obtained video surveillance from nearby crime cameras, private residences, and businesses.

At trial, Detective Goudia and Lieutenant Christie Chauvin, the secondary detective at the time, testified regarding the significance of these videos in their investigation of the incident.  They explained the video obtained from a camera on Redwood depicted two people traveling south from the feed store.  One of the individuals wore a red sweatshirt and was walking, and the other, who was dressed in black with a screen printed shirt, was running with an object in his hands, later identified as the portion of a cash register which holds the money.  The officers then used the clothing description from the Redwood video to locate the suspects in other surveillance videos.  While reviewing those videos, Lieutenant Chauvin identified defendant from the video taken inside the Min Hui Mart.  That video showed Dracier Dewey and defendant together, with defendant wearing a tee shirt

---

[5] At trial, Dr. Michael DeFatta, a forensic pathologist, testified that he conducted an autopsy on Mr. Finckbeiner, which revealed that the victim died as a result of three gunshot wounds, one to the right upper chest, one to the right ear, and one behind the right ear.

[6] Deputy Dean, a K-9 handler, testified that after other officers arrived on the scene, he utilized his dog to attempt to track potential suspects, but that attempt was unsuccessful.

[7] It is noted that a loaded .38 caliber revolver was found at the scene; however, it was determined that this gun belonged to Mrs. Finckbeiner and had not been fired.

with the image of a missing couple on it. After Lieutenant Chauvin's identification of defendant, Detective Goudia began preparing an arrest warrant for him.

In the meantime, the suspects' images from one of the videos were broadcast on television. Shortly thereafter, Dracier Dewey surrendered to police on February 26, 2014, and gave a recorded statement. Mr. Dewey was also shown a photographic lineup and positively identified defendant as the person in the feed store.

After Mr. Dewey's statement, Detective Goudia obtained search warrants for both defendant's and Dewey's residences. Sergeant Staty Lewis, who executed the search warrant at defendant's home, seized black pants, a black bandana, a black long sleeve shirt, and black and red shoes, which were consistent with the clothing worn by the individual in the videos. In addition, Detective Goudia, who was present at the time of the search, noted that there were puppies in defendant's residence, which was significant because defendant went to the feed store to buy shots for his puppies. Defendant was arrested on February 27, 2014.

Approximately ten days after the incident, Mrs. Finckbeiner went to the detective bureau for an interview, at which time Detective Goudia presented her with photographic lineups. Mrs. Finckbeiner positively identified defendant as the man who shot her and her husband and Dracier Dewey as the other man who entered the store, did not speak, and then remained outside while they were shot. In addition, Mrs. Finckbeiner positively identified defendant in court as the man who shot her and her husband.

At trial, Dracier Dewey testified about his activities with defendant on the day of the incident. On that morning, he accompanied defendant from Reserve, where they both lived, to LaPlace for defendant to get a haircut. The person who drove them dropped them off at the hair salon for defendant's 10:00 a.m. appointment; however, no one was there, and a sign on the door stated that the

salon would reopen at 2:00 p.m.[8] The two men then went to an acquaintance's house to pass the time drinking and smoking. Mr. Dewey verified that on the way to the house, they stopped at the Min Hui Mart. When the pair returned to the hair salon around 2:00 p.m., it was still closed. On the way back to the same house, defendant decided to stop at the feed store to buy shots for his puppy.

Mr. Dewey recalled that they walked into the store, and defendant spoke to a man and woman about the shots for his puppy. The two men left the feed store, but defendant went back inside. Mr. Dewey then heard gunshots, and shortly thereafter defendant exited with a cash register. Mr. Dewey, who was on the other side of the street, became scared when he saw defendant running with the cash register, and he thereafter removed his red jacket and threw it away in a trash can on Pine Street.[9] Mr. Dewey relayed that defendant wore all black clothing with a tee shirt depicting a missing couple from Reserve.

A few blocks from the feed store, Captain Randall Joseph encountered Mr. Dewey and asked if he had any weapons on him and conducted a pat down, during which Captain Joseph found no weapons. Captain Joseph also asked Mr. Dewey if he knew anything about a shooting at the feed store. Mr. Dewey denied being aware of the incident, and Captain Joseph let Dewey go.[10] However, after video was released on the news showing Mr. Dewey walking down the street, Mr. Dewey surrendered to police and was arrested. He then gave a recorded statement to police and also positively identified defendant in a photographic lineup as the person in the feed store. At trial, Mr. Dewey maintained that he never saw

---

[8] Helana Miles testified that on February 25, she arrived at her hair salon around 9:45 a.m., but defendant did not show up for his 10:00 a.m. appointment. She stated that she had never cut defendant's hair before, and the appointment was made by his father, whom she knew. She testified that the salon only had an open and closed sign.

[9] Lieutenant Thomas Ricks located the red sweatshirt in a trash can near 277 Pine Street.

[10] Captain Joseph testified that he was in the area looking for potential perpetrators when he encountered Dracier Dewey, who was not wearing a red sweatshirt at that time. Captain Joseph's testimony of the encounter was similar to Mr. Dewey's account. Captain Joseph further testified that he later realized that the interaction may be relevant to the investigation and reported it to Detective Goudia.

defendant with a gun that day and that they did not talk about killing or robbing anyone.

### SUFFICIENCY OF THE EVIDENCE
*(Assignment of Error Number Four)*

On appeal, defendant challenges the sufficiency of the evidence used to convict him of second degree murder and armed robbery.[11] Defendant specifically contends that the State failed to refute the reasonable possibility that the shooter was someone else, noting the lack of physical evidence linking him to the crimes, the unreliability of Mrs. Finckbeiner's identification of him as the perpetrator, and the inconsistent, unbelievable testimony of Dracier Dewey.

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mickel*, 09-953 (La. App. 5 Cir. 5/11/10), 41 So.3d 532, 534, *writ denied*, 10-1357 (La. 1/7/11), 52 So.3d 885.

When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *State v.*

---

[11] In *State v. Kelly*, 19-425 (La. App. 5 Cir. 7/31/20), 299 So.3d 1284, 1287, this Court noted that when a claim of insufficiency of evidence is found to have merit, it results in a reversal due to a failure to prove a charge beyond a reasonable doubt, to which jeopardy attaches and the case cannot be retried. Thus, a sufficiency of the evidence analysis precedes consideration of whether a verdict must be vacated and remanded under *Ramos v. Louisiana*, 590 U.S. --, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020).

*Cox*, 17-508 (La. App. 5 Cir. 2/21/18), 239 So.3d 465, 476-77, *writ denied*, 18-455 (La. 1/14/19), 261 So. 3d 782.

In the present case, defendant was convicted of second degree murder and armed robbery with a firearm. Second degree murder is defined in La. R.S. 14:30.1(A)(1), in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Armed robbery is defined in La. R.S. 14:64(A) as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. Ray*, 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, *writ denied*, 13-1115 (La. 10/25/13), 124 So.3d 1096.

It is not the function of the appellate court to assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442, 443. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 84, *writs denied*, 03-2745 (La. 2/13/04), 867 So.2d 688 and 08-1951 (La. 1/30/09), 999 So.2d 750. Additionally, under Louisiana law, a victim's or witness' testimony alone is usually sufficient to support the verdict. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Anderson*, 18-45 (La. App. 5 Cir. 10/17/18), 258 So.3d 997, 1004, *writ denied*, 18-1848 (La. 4/15/19), 267 So.3d 1131.

In the present case, the record reveals that the State proved beyond a reasonable doubt that defendant was the perpetrator of the murder and armed robbery that occurred at the LaPlace Feed Store. At trial, Mrs. Finckbeiner testified that on February 25, 2014, two young men came into the store, and she spoke to the taller, thinner one at the counter about shots for his puppy while the shorter man walked around the store. After they left the store, Mrs. Finckbeiner looked out the front window and noticed the two men standing across the street. She mentioned this to her husband, who was in his office, and as she turned to walk away, a gun was placed to her temple and a trigger was pulled. Mrs. Finckbeiner recalled that she saw the gun through a black sleeve. She fell to the floor and heard another gunshot and a person asking for the "f'n money." She also testified that at some point the cash register was thrown at her, and she again heard the perpetrator say that he wanted the "f'n money." The perpetrator then picked up the cash register and left the store. Afterwards, Mrs. Finckbeiner dragged herself to the door to lock it and saw the two men standing next to each other across the street. Mrs. Finckbeiner positively identified defendant and Dracier Dewey in photographic lineups. Mrs. Finckbeiner also identified defendant at trial as the person who shot her and her husband.

In addition, Dracier Dewey testified that he and defendant went into the feed store, and defendant spoke to a man and a woman about shots for his puppy. According to Mr. Dewey, they left the feed store, but defendant went back inside. Mr. Dewey heard gunshots, and shortly thereafter, defendant exited the store with a cash register. Mr. Dewey identified defendant in a photographic lineup as the person he was with in the feed store. In addition, video surveillance placed defendant in the area of the feed store around the time of the incident and also showed an individual, subsequently identified as defendant, running south from the feed store with an object in his hands believed to be a portion of the cash register.

Further, black clothing was seized from defendant's house consistent with the black clothing worn by the individual in the videos.

On appeal, defendant's argument challenging the sufficiency of the evidence focuses on the lack of credibility of Dracier Dewey's testimony, the unreliability of Mrs. Finckbeiner's identification, the police's initial detention of two other suspects in the case, and the lack of physical evidence connecting defendant to the crimes.

With regard to Mr. Dewey's lack of credibility, defendant contends that he "gave inconsistent, unbelievable, self-serving testimony." Defendant specifically notes Mr. Dewey's testimony that he would get his "freedom" and be released from jail immediately in exchange for his testimony and further cites various aspects of Mr. Dewey's testimony that make it incredible. For example, defendant points out that Mr. Dewey did not know the person who drove them to LaPlace or the name or address of the person's house they went to in LaPlace. Further, Mr. Dewey did not explain why he went with defendant to get his haircut, why he did not ask defendant the reason he was going back into the feed store, or why he did not wait for defendant outside the feed store.

Despite these deficiencies in Mr. Dewey's testimony that allegedly make it unbelievable, we note, as the State did in its appellate brief, that Mr. Dewey's testimony was consistent with the account given by Mrs. Finckbeiner. We also note that Mr. Dewey's testimony about being stopped in the area of the feed store after the incident was consistent with that of Captain Joseph. In addition, the video surveillance verified Mr. Dewey's account of their whereabouts on the day of the incident, and the red jacket he was wearing was located in a trash can, consistent with his account that he threw it away.

On appeal, defendant also complains about the use of Mrs. Finckbeiner's identification to support his convictions. He reasons that, other than the

unbelievable testimony by Mr. Dewey, the only evidence placing defendant at the store at the time of the shooting and robbery was the testimony of Mrs. Finckbeiner, whose identification of defendant was unreliable. Defendant points out that Mrs. Finckbeiner never gave a detailed description of the shooter or his clothing, that she testified that all she saw was the "trigger through the sleeve," and that it was likely, given the extensive media coverage, that Mrs. Finckbeiner saw defendant's photograph prior to her identification of him.

In the present case, Mrs. Finckbeiner was consistent in her descriptions, had the opportunity to view defendant, and maintained that she did not see a photograph of defendant in news coverage prior to making her identification. Further, in Assignment of Error Number Two, this Court fully discusses Mrs. Finckbeiner's identification and finds no merit to defendant's argument that her identification was suggestive, unreliable, or in any way tainted by extensive media coverage showing his photograph.

In an effort to bolster his argument that the evidence was insufficient to establish he was the shooter, defendant points out that two other individuals were initially detained as suspects. At trial, Detective Goudia acknowledged Alonzo Narcisse and Corey Anderson were originally detained as suspects based on the fact that Mr. Narcisse had on a red hoodie, similar to one worn by one of the suspects in the video surveillance. Detective Goudia further stated that a K-9 was used to sniff Mr. Narcisse's clothing and alerted in a sit format, which indicated that the dog found some type of trace of explosive. Detective Goudia interviewed Mr. Narcisse, who gave him names of people who would provide an alibi, and after speaking with Mr. Narcisse's mother, Detective Goudia had no more reason to suspect Mr. Narcisse. Further, pursuant to a warrant, a search was conducted at Mr. Narcisse's house, which failed to reveal any evidence related to the offenses. With regard to Mr. Anderson, Detective Goudia advised that he did not conduct an

interview with him because he did not match the description given by Mrs. Finckbeiner.

In addition, the jury heard testimony from Lieutenant Chauvin about Alonzo Narcisse and Corey Anderson. She testified that she is familiar with Alonzo Narcisse, that Mr. Narcisse was wearing a red sweatshirt at the time he was a suspect, and that Mr. Narcisse is significantly taller than Mr. Dewey. Lieutenant Chauvin also testified that Mr. Anderson and defendant looked nothing alike and that Mr. Anderson had a "dread lock" hairstyle.

In the present case, the jury was presented with this information about the two initial suspects and obviously, by its verdict, accepted the police officers' explanations as to the reasons they were eliminated as suspects. The jury's rejection of this theory that the offenses were committed by other individuals involves a credibility determination which this Court will not reweigh on appeal.

As another aspect of his sufficiency of the evidence argument, defendant points out that there was no physical evidence presented to link him to the crimes. Defendant mentions that the potential murder weapon was not recovered, no blood from the victims was found on the clothing seized from defendant's house,[12] no fingerprints or DNA was recovered, and the shirt depicting the missing couple and the cash register were not found. This Court has held that the production of a weapon or other physical evidence is not required as long as the State can establish each element of the offense beyond a reasonable doubt through the testimony of its witnesses. *State v. Lee*, 97-1035 (La. App. 5 Cir. 2/11/98), 709 So.2d 226, 227.

In sum, the jury was made aware of the issues surrounding Mr. Dewey's credibility and the circumstances surrounding Mrs. Finckbeiner's ability to identify defendant. The jury was also informed of the lack of physical evidence connecting

---

[12] Dr. DeFatta stated that based on the distance between Mr. Finckbeiner and the shooter, he would not expect the shooter to have blood on him.

defendant to the crimes and heard testimony regarding the initial detention of two other individuals as suspects. By its verdict, the jury obviously chose to believe the testimony and evidence that identified defendant as the perpetrator. These credibility determinations will not be reweighed on appeal. *State v. Anderson,* 258 So.3d at 1004.

In light of the foregoing reasons, we find that the State established the elements of the offenses beyond a reasonable doubt, including defendant's identity as the perpetrator. Accordingly, the arguments raised by defendant relating to the sufficiency of the evidence are without merit.

### NON-UNANIMOUS JURY VERDICT
*(Assignment of Error Number Five)*

Defendant argues that his non-unanimous jury verdict for second degree murder violates his Sixth and Fourteenth Amendment rights to due process and equal protection. In light of the recent decision of the United States Supreme Court in *Ramos v. Louisiana*, 590 U.S. --, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), we find this assignment of error has merit.

In the present case, defendant was found guilty of second degree murder. La. R.S. 14:30.1 provides that whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Since the punishment for this offense is necessarily confinement at hard labor, a jury of twelve persons was required. *See* La. Const. Art. I, § 17; La. C.Cr.P. art. 782; La. R.S. 14:30.1. The record reflects that on March 28, 2019, the jury found defendant guilty of second degree murder by a vote of eleven to one.

19-KA-594                                                13

Non-unanimous verdicts were previously allowed under La. Const. Art. I, § 17 and La. C.Cr.P. art. 782 and the circumstances of the instant case.[13]  However, in *Ramos*, the United States Supreme Court found that the Sixth Amendment right to a jury trial - as incorporated against the states by the Fourteenth Amendment - requires a unanimous verdict to convict a defendant of a serious offense.[14]  The Court concluded: "There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal trials equally … So if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court."  As a result of the Supreme Court's decision in *Ramos*, defendants, who were convicted of serious offenses by non-unanimous juries and whose cases are still pending on direct appeal, are entitled to new trials.

Since defendant was convicted of a serious offense by a non-unanimous verdict and his case is still on direct review, we find that defendant is entitled to a new trial on the second degree murder charge, and accordingly, we vacate that conviction and sentence and remand the matter for further proceedings.  *See State v. Kelly*, 19-425 (La. App. 5 Cir. 7/31/20), 299 So.3d 1284.

<u>**CHANGE OF VENUE**</u>
*(Assignment of Error Number One)*

On appeal, defendant contends that the trial court erred in denying his motion for change of venue.  He maintains that he was not given a fair and impartial trial due to extensive publicity of the crime and prejudicial statements by law enforcement, which tainted the jury pool.

---

[13] Defendant's offenses were committed prior to January 1, 2019, and therefore, the pre-amendment version of the statutes applied at the time, requiring that ten jurors must concur to render a verdict. *See* La. Const. Art. I, § 17 and La. C.Cr.P. art. 782(A).

[14] For purposes of the Sixth Amendment, federal law defines petty offenses as offenses subject to imprisonment of six months or less and serious offenses as offenses subject to imprisonment over six months.  The Sixth Amendment's right to a jury trial attaches to serious offenses. *See generally Lewis v. United States*, 518 U.S. 322, 327-28, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996); *Hill v. Louisiana*, 2013 WL 486691 (E.D. La. 2013).

On December 19, 2018, defendant filed a motion for change of venue, arguing that he could not obtain a fair and impartial jury due to the extensive pretrial publicity surrounding the incident, the community attitudes toward the victims and victims' family, and media coverage reflecting a predetermination of defendant's guilt. Attached to defendant's motion was a sampling of the pretrial publicity, including news articles, public comments on the news articles, and the amount of times the news articles were shared.

On January 3, 2019, the Court conducted a hearing on defendant's motion, during which defense counsel supplemented the motion for change of venue with a December 22, 2018 article about the incident and the online public comments relating to the article. After considering the arguments of counsel and the evidence produced in support of defendant's motion, the trial court determined that defendant failed to show, at this point of the proceedings, that a change of venue was warranted. However, the trial court then deferred its actual ruling until trial to allow the court the opportunity to consider the *voir dire* proceedings. The trial court ultimately denied defendant's motion for change of venue on March 28, 2019, while the jury deliberated. Defendant now contends that as a result of this ruling, he did not receive a fair and unbiased trial because the jury pool had been tainted during the years between the crimes and the trial due to the extensive pretrial publicity.

A defendant is constitutionally guaranteed an impartial jury and a fair trial. La. Const. Art. I, § 16. To accomplish this end, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial at the place of original venue. *State v. Manning*, 03-1982 (La. 10/19/04), 885 So.2d 1044, 1061, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005); *State v. Logan*, 07-739 (La. App. 5 Cir. 5/27/08), 986 So.2d

772, 781, *writ denied*, 08-1525 (La. 3/13/09), 5 So.3d 117, *cert. denied*, 558 U.S. 856, 130 S.Ct. 142, 175 L.Ed.2d 93 (2009).

La. C.Cr.P. art. 622 provides the grounds for a change of venue:

> A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.

> In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.

Absent unusual circumstances, the defendant bears the burden of showing actual prejudice. To meet this burden, a defendant must prove more than mere public knowledge or familiarity with the facts of the case to be entitled to have his trial moved to another parish; rather, the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial. Thus, a defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime. *State v. Clark*, 02-1463 (La. 6/27/03), 851 So.2d 1055, 1070-71, *cert. denied*, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004); *State v. Logan*, 986 So.2d at 782. Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion. *State v. Magee,* 11-574 (La. 9/28/12), 103 So.3d 285, 298, *cert. denied*, 571 U.S. 830, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013); *State v. Logan*, *supra*.

Several factors are pertinent in determining whether actual prejudice exists rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length

of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on *voir dire*. *State v. Bell*, 315 So.2d 307, 311 (La. 1975); *State v. Logan*, *supra*.

In reviewing a denial of change in venue, the primary task of the court is to inquire as to the nature and scope of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial in order to ascertain whether prejudice existed in the minds of the public which prevented the defendant from receiving a fair trial. The seven factors enumerated in *Bell* help facilitate this inquiry into the nature and scope of publicity disseminated in the community where a crime occurred. *State v. Clark,* 851 So.2d at 1071. Courts must distinguish, however, largely factual publicity from that which is invidious or inflammatory, as the two present real differences in the potential for prejudice. In addition, courts have examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind. *State v. Clark, supra; State v. Magee*, 103 So.3d at 299.

After reviewing the record and the applicable jurisprudence, including the factors set forth in *Bell*, we agree with the trial court's determination that defendant failed to prove that a change of venue was warranted. Defendant submitted approximately twenty-five documents in support of his motion for change of venue, including news articles from newspapers and television stations, the online comments, and the amount of shares for some of the articles. We have reviewed these documents and find them to largely consist of factual accounts of the crimes and apprehension of the suspects rather than inflammatory material. We note that

the majority of news reports occurred right after the crime in February of 2014. These articles generally gave a factual account of the incident, video images and information necessary to help in the apprehension of the suspects, and updates about the suspects' arrests. A few of the articles were from May of 2014, and informed the public that indictments had been filed and the death penalty was being sought. In addition, many of the articles contained repetitive information. Further, while the sheriff was quoted in some of these articles, there is nothing to suggest that he was connected to any publicity other than the release of video surveillance in an effort to apprehend the perpetrators and a press release informing the public that arrests had been made.

With regard to the length of time between the publicity and trial, defendant was not tried until March of 2019, approximately five years after the majority of the articles appeared. Although defendant provided an article that was dated December 22, 2018, the record does not contain or suggest any publicity immediately preceding trial or that the publicity of the offenses remained at as high of a level as it originally was at the time of their commission.[15] With regard to the severity and notoriety of the offenses, the armed robbery and shooting in the middle of the day of two well-known and well-liked members of the community are quite disturbing and tragic. However, we note that this was not the first murder case to be tried in St. John the Baptist Parish, and by the time the matter proceeded to trial, defendant's charge had been reduced from first degree murder to second degree murder.

---

[15] *See State v. Magee*, 103 So.3d at 302 (no change of venue when over two years elapsed between the initial flurry of media reports and the start of trial); *State v. Sparks*, 88-17 (La. 5/11/11), 68 So.3d 435, 458, *cert. denied*, *El-Mumit v. Louisiana*, 566 U.S. 908, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012) (no change of venue when over two years elapsed between media accounts following the murder and arrest of the defendant and the trial); and *State v. Rumley*, 14-1077 (La. App. 4 Cir. 12/16/15), 183 So.3d 640, 672, *writs denied*, 16-65 (La. 1/13/17), 215 So.3d 241, and 16-36 (La. 3/24/17), 216 So.3d 812 (no change of venue when trial commenced more than two years after arrests and the initial media exposure).

As to the area from which the jury is drawn, defense counsel notes that St. John the Baptist Parish is relatively small with a population of approximately 43,000. However, the Louisiana Supreme Court has noted that smaller parishes are not improper venues merely because of the local population's familiarity with the offense. *State v. Clark*, 851 So.2d at 1075.

To support his argument that the jury pool was tainted and biased against him, defendant points out that a review of *voir dire* indicates that an overwhelming majority of prospective jurors were familiar with the case and that twenty prospective jurors admitted to knowing the victims. A review of the *voir dire* does indicate that a majority of the jurors were at least vaguely familiar with the case through conversations with others or from reading or hearing about it on television, in newspapers, or through social media. However, almost all of the jurors questioned said that they had learned about the incident when it happened and had not seen or heard anything about the incident recently. In addition, the majority of jurors who were actually questioned on the issue indicated that they could be fair and had not formed any opinions based on the pretrial publicity. Further, we have no indication that any prospective juror personally commented on any news articles or made social media posts about the incident.

With regard to the prospective jurors who knew the victims, many of those were simply customers at the store and indicated that they could be fair and impartial despite the fact that they occasionally shopped there. Those few jurors who said they could not be fair and impartial based on their relationship with the victims constituted a very small percentage of the prospective jurors who were questioned, and they were dismissed from the case. Lastly, we note that defendant does not claim that any of the jurors who actually decided his case had a close relationship with the victims or had formed any fixed opinions about the case based on pretrial publicity.

In light of the foregoing, we find that defendant has failed to prove that a change of venue was warranted, and therefore, we find no abuse of discretion in the trial court's denial of defendant's motion for change of venue.

## MOTION TO SUPPRESS IDENTIFICATION
### *(Assignment of Error Number Two)*

On appeal, defendant also challenges the trial court's denial of his motion to suppress the identification. He maintains that Mrs. Finckbeiner's identification of him as the perpetrator in a six-person photographic lineup was both suggestive and unreliable and should have been suppressed.

At the March 13, 2017 suppression hearing, Detective Goudia and Mrs. Finckbeiner testified regarding the circumstances surrounding the presentation of the photographic lineup and the subsequent positive identification of defendant as the shooter. Detective Goudia testified that the day after the shooting, Dracier Dewey gave a statement and provided the officers information and a description of the person he was with at the feed store, whom he identified by the nickname "Jonas."[16] In addition, at the time of the shooting, Detective Goudia spoke briefly to Mrs. Finckbeiner, who provided him with a brief description of the perpetrators. Based on the information and descriptions obtained, Detective Goudia had another officer generate a six-person photographic lineup, which he thereafter presented to Mr. Dewey and Mrs. Finckbeiner.

Detective Goudia stated that about "a week or so" after the incident, he interviewed Mrs. Finckbeiner at the detective bureau and her description of the perpetrators was consistent with that originally given at the feed store. He also presented her with a photographic lineup in a manila folder and told her if she recognized anybody from the day of the incident, to let him know, to circle and

---

[16] Detective Goudia could not recall how they connected defendant to his nickname but believed that another officer knew a "Jonas" from another case, and that individual's description matched the identifying information given by Mr. Dewey. At trial, Mr. Dewey referred to defendant's street name as "Joney."

initial it, and then tell him where she knew the individual from. According to Detective Goudia, Mrs. Finckbeiner circled defendant's photograph within seconds, identifying him as the person who shot her and her husband.

Next, Mrs. Finckbeiner testified at the hearing about her ability to see defendant on the day of the shooting as well as her subsequent positive identification of him. Mrs. Finckbeiner stated that the shooting occurred after 2:00 p.m. and that the store had both fluorescent lighting and small windows. Further, she relayed that she observed the individuals while she spoke to them for a few minutes from four to five feet away, and that her attention was directed at both of the individuals while she spoke to them. She confirmed that she had her eye glasses on at the time of the incident and described the individuals, stating that one was tall and thinner and one was shorter. Mrs. Finckbeiner also described that one individual had "puffy hair," and the other had a "regular short Afro-type hair." She said they both wore large clothes, and she did not see any tattoos or gold teeth. First, she saw the two individuals in the store. Next, she saw them through the store window. Finally, she saw just defendant when he came back in the store.

Mrs. Finckbeiner testified that she subsequently went to the detective bureau and was presented with photographic lineups.[17] She asserted that prior to the presentation of the lineups, no one had shown her photographs of any suspects nor had she seen any news about the shooting because she did not want anything to compromise her identification. During the suppression hearing, Mrs. Finckbeiner was presented with the photographic lineup and identified her signature and writing, identifying defendant as the person who shot her and her husband.

At the conclusion of the hearing, the trial court denied defendant's motion to suppress the identification. Defendant now challenges this ruling, contending that

---

[17] Mrs. Finckbeiner was also presented with a photographic lineup that contained Dracier Dewey's photograph. As previously noted, Mrs. Finckbeiner positively identified Dracier Dewey as the man who entered the store with defendant.

Mrs. Finckbeiner's identification of him in the photographic lineup was unreliable and suggestive. Defendant points out that Mrs. Finckbeiner gave limited descriptions of the perpetrators and never saw the face of the shooter but only saw the trigger "through the sleeve." Further, defendant asserts that Mrs. Finckbeiner's identification was tainted due to the extensive media coverage that showed defendant's picture between the time of the crimes and her identification, making it likely that Mrs. Finckbeiner saw his picture prior to her identification.

Generally, a defendant has the burden of proof on a motion to suppress an out-of-court identification. La. C.Cr.P. art. 703(D); *State v. Bradley*, 11-1060 (La. App. 5 Cir. 9/25/12), 99 So.3d 1099, 1105, *writ denied*, 12-2441 (La. 5/3/13), 113 So.3d 208. In order to suppress an identification, a defendant must first prove that the identification procedure was suggestive. *State v. Higgins*, 03-1980 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). A photographic lineup is considered suggestive if the photographs display the defendant in such a manner that the witness' attention is unduly focused on the defendant. A lineup is also suggestive if there is not a sufficient resemblance of characteristics and features of the persons in the lineup. However, strict identity of physical characteristics among the persons depicted in the photographic array is not required; all that is required is a sufficient resemblance to reasonably test the identification. *State v. Grimes*, 09-2 (La. App. 5 Cir. 5/26/09), 16 So.3d 418, 429, *writ denied*, 09-1517 (La. 3/12/10), 28 So.3d 1023.

Even if an identification process is suggestive, the defendant must also show there was a substantial likelihood of misidentification as a result of the identification procedure. Under *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the factors the courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a

substantial likelihood of misidentification include: the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *State v. Honore*, 09-313 (La. App. 5 Cir. 1/12/10), 31 So.3d 485, 497.

In evaluating the defendant's argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. A trial court's determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. *State v. Honore*, 31 So.3d at 497.

From our examination of the lineup, we find that the photographs were not displayed in such a manner as to unduly focus attention on defendant. Further, it appears that the physical characteristics of the other men in the lineup sufficiently resembled defendant to reasonably test the identifications made. We note that the photographs are of the same size and reflect the same background. The photographs consist of six males, two with light-colored shirts and four with dark-colored shirts. Three appear to be wearing some type of hoodie. The males appear to have similar skin tones and hairstyles and seem to be approximately the same age.

Considering the foregoing, defendant did not prove the identification procedure was suggestive. Further, even if the lineup is considered suggestive, there was no substantial likelihood of misidentification in this case. Mrs. Finckbeiner had a clear opportunity to view the perpetrator on the day of the incident. She stated that it was daylight and that the store had both fluorescent lighting and windows. She further testified that she spoke for several minutes with defendant from just four to five feet away when he was in the store the first time

and that she was wearing her glasses at the time of the interaction. As to her degree of attention, Mrs. Finckbeiner asserted that the only people in the store at the time besides her and her husband were the two individuals she identified. The record indicates that Mrs. Finckbeiner's description of the perpetrators remained consistent. Further, Mrs. Finckbeiner testified at trial that she was absolutely sure defendant is the person who shot her and her husband. Detective Goudia stated that Mrs. Finckbeiner selected defendant's photograph from the lineup within seconds. Finally, we note that only ten days elapsed between the time of the crimes and the identification.

In his appellate brief, defendant focuses on the fact that Mrs. Finckbeiner's identification was tainted by the possibility that she saw defendant's photograph on the news prior to her identification due to the extensive media coverage of the incident. This Court has held that an identification procedure is not suggestive merely because a witness has previously seen a defendant's photograph. *State v. Carter*, 15-99 (La. App. 5 Cir. 7/29/15), 171 So.3d 1265, 1282-83, *writ denied*, 15-1618 (La. 10/17/16), 207 So.3d 1068. Further, Mrs. Finckbeiner specifically testified that no one showed her photographs of any suspects prior to the incident, nor had she seen any photographs in the news.

In light of the foregoing, we find no abuse of discretion in the trial court's denial of defendant's motion to suppress identification.

## ADMISSION OF TESTIMONY WITHOUT *DAUBERT* HEARING
### *(Assignment of Error Number Three)*

On appeal, defendant also contends that the trial court erred in allowing the testimony of the State's witness, Patrick Lane, without granting the defense motion for a *Daubert* hearing.

On February 27, 2019, defendant filed a motion to exclude the testimony of the State's firearm expert, Patrick Lane, asserting that ammunition comparisons

and firearm identification are not reliable and do not satisfy the standards for the admissibility of scientific evidence set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). At the subsequent hearing, defense counsel argued that Mr. Lane's report failed to document the methodology he used in his analysis, and therefore, defendant was unable to ascertain whether Mr. Lane used an accepted methodology. Defendant maintained that since there is no proof that he used the correct science, Mr. Lane's testimony should be excluded or a *Daubert* hearing should be held prior to allowing its admission.

In response, the State maintained that defendant's request for a *Daubert* hearing should be denied because defendant was not attacking the science Mr. Lane relied on, but rather was attacking his credibility based on omissions from his report, which could be addressed at trial when his credentials are presented. The State also noted that Mr. Lane had testified in numerous cases and his testimony and the science used have been upheld.

After affording defendant the opportunity to reply to the State's argument, the trial court denied defendant's motion to exclude the evidence and his request for a *Daubert* hearing. The trial court reasoned as follows:

> … I have seen Mr. Lane in many passings through the years. He's an expert in rather several expert areas of expertise that if what he sends to us today may not be the perfect report. It may not be the best report he's ever written, but I read it several times, and I'm not going to prohibit his testimony based on his report. I'm not going to prohibit his testimony based on his previous testimony of other cases in which he's testified as to these very specific areas of expertise. I don't think the defense has raised quite enough evidence that I would need to actually formerlly[sic] mount a Daubert hearing either now or during the trial. You may ask that it be considered at almost any time. But on the show you made today, I'm not going to grant the motion about curtailing his testimony or excluding his testimony, and, at this time, we do not find that a Daubert hearing is actually necessary.

Defendant objected and reurged his motion for a *Daubert* hearing at trial prior to Mr. Lane being called as a witness. The trial judge denied the motion, stating that this area of law is settled, it is a recognized specialty, Mr. Lane has testified in many cases, and believed he had even testified before him, where he was approved as an expert.

Over defendant's objection, Mr. Lane, after being questioned regarding his qualifications, was thereafter accepted and allowed to testify as an expert in firearms and firearms identification. At trial, Mr. Lane testified that he examined four bullets in relation to this case - three recovered during the autopsy and one recovered at the feed store. He relayed that these bullets were most consistent with a .38 or a .357 caliber ammunition and shared the same characteristics. He further testified that two of the bullets, one from the victim's body and one from the scene, were fired from the same gun; however, the other two bullets were too damaged to determine if they were fired from the same weapon. During his testimony, Mr. Lane also viewed the gun that was retrieved from the scene, identified it as a Smith and Wesson Model Number 36, and testified that this gun could not have fired the four recovered bullets.

During cross-examination, Mr. Lane acknowledged, in response to defense counsel's questions, that he did not attach various documents to his report, including accreditation documents, chain of custody, or bullet protocol. He also acknowledged that he did not attach photographs or his observations, including any differences in the bullets under the microscopic examination, to his report. When defense counsel asked the reason for these omissions, Mr. Lane replied that this information is available online and counsel could have obtained that information. Defense counsel objected and asked the trial court to strike that comment, which request was denied.

On re-direct examination by the State, Mr. Lane stated that the defense lawyers had not called him about the possibility of sending the bullets to another examiner. Defense counsel objected on the basis that the State was transferring the burden and giving the jury the impression that defendant had a duty to test the bullets. The trial court stated, "We can certainly include that in a charge for the jury." Thereafter, Mr. Lane stated that, to his knowledge, defense counsel did not ask him for copies of the protocols, prompting another objection by defendant. After the trial court overruled the objection, defendant moved for a mistrial on the basis that "the jury has been tainted by the fact that we have a duty to do something we do not have to do." The trial court denied defendant's motion for mistrial, finding that his argument did not meet the grounds for a mistrial pursuant to La. C.Cr.P. arts. 770 and 775. Defendant now challenges the denial of his motion for a *Daubert* hearing and the denial of his motion for a mistrial.

With regard to the admission of Mr. Lane's testimony, defendant complains that the trial court erred in allowing Mr. Lane's testimony without first conducting a *Daubert* hearing, asserting that Mr. Lane failed to support his conclusion that two of the bullets came from the same weapon with scientific evidence. Defendant points out that Mr. Lane "did not specify what type of markings on the bullets were similar and which characteristics were dissimilar, how much weight he gave each characteristic, how many characteristics he considered, whether he considered that some of the individual characteristics that he relied upon were actually subclass characteristics, whether any of the individual characteristics may have changed over time, or any other information that would allow a fact-finder to weigh the evidence appropriately."

La C.E. art. 702 governs the admissibility of expert testimony and provides that a witness, who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if

the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue.

In *State v. Foret*, 628 So.2d 1116 (La. 1993), the Louisiana Supreme Court adopted the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, supra*, regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable. The *Daubert* inquiry consists of four considerations: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted by the relevant scientific community. *See also State v. Boudoin*, 11-967 (La. App. 5 Cir. 12/27/12), 106 So.3d 1213, 1225, *writ denied*, 13-255 (La. 8/30/13), 120 So.3d 260.

The trial court may consider one or more of the four *Daubert* factors but that list of factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999); *State v. Boudoin*, 106 So.3d at 1225.

In *State v. Johnson*, 52,128 (La. App. 2 Cir. 8/15/18), 253 So.3d 887, 899, the appellate court observed: "It is important to note, however, that there is a crucial difference between questioning the methodology employed by an expert witness and questioning the application of that methodology or the ultimate conclusions derived from that application. Only a question of the validity of the methodology employed brings *Daubert* into play." The party demanding a pretrial *Daubert* hearing requesting the determination of the reliability of evidence must set forth sufficient allegations showing the necessity for such a determination. *Id.*

The trial court, in its discretion, can determine on a case by case basis, if a *Daubert* hearing is necessary to test the reliability of expert testimony. *State v. Chauvin,* 02-1188 (La. 5/20/03), 846 So.2d 697, 709; *State v. Johnson*, *supra*.

In the present case, we find no abuse of discretion in the trial court's admission of Mr. Lane's testimony without first conducting a *Daubert* hearing. Mr. Lane testified that he worked in the field for over forty years and previously qualified as an expert four hundred and sixty-five times in district and federal courts in Louisiana, Mississippi, Georgia, Florida, and Virginia, including numerous times as an expert in firearms and toolmark identification. Further, expert testimony regarding firearms identification has long been accepted in both state and federal courts. *State v. Williams*, 42,914 (La. App. 2 Cir. 1/9/08), 974 So.2d 157, 162-63, *writ denied*, 08-465 (La. 9/26/08), 922 So.2d 983. Lastly, Mr. Lane testified regarding his methodology of examining projectiles for similar characteristics and was subject to cross-examination by defense counsel on the methodology and protocols he used in his analysis of the bullets.

Furthermore, we find that even if the trial court did err in not conducting a *Daubert* hearing prior to allowing the testimony of Mr. Lane, that error was harmless. No weapon was recovered in this case that the State attempted to forensically link to defendant. The only weapon recovered in this case was Mrs. Finckbeiner's .38 caliber revolver, which the State did not allege to be the murder weapon and did not attempt to forensically link to defendant. Therefore, the purpose of Mr. Lane's expert testimony regarding ballistics was not to link the bullets recovered at the murder scene to defendant, but rather to exclude Mrs. Finckbeiner's revolver as the potential murder weapon, thus negating any implication that Mrs. Finckbeiner committed these crimes.

Even without the eyewitness testimony of Mrs. Finckbeiner implicating defendant, the other evidence in the case implicating defendant is so overwhelming

that any theory or suggestion that Mrs. Finckbeiner used her revolver to kill her husband and then shoot herself in the face is highly implausible, even without the testimony of Mr. Lane excluding her revolver as the murder weapon. The most compelling evidence identifying defendant as the perpetrator of these crimes is the eyewitness testimony of Mr. Dewey and the video surveillance evidence, which corroborates much of Mr. Dewey's version of the crimes, and shows defendant running from the crime scene shortly after the robbery and murder with a part of the cash register in his hands.

As part of this assignment of error, defendant also contends that the trial court erred in denying his motion for mistrial after comments were made that could be construed as burden shifting. Specifically, defendant complains about the prosecutor's questions and Mr. Lane's answers that suggested that defendant could have tested the bullets and could have asked for copies of the protocols. In his appellate brief, defendant recognizes that a mistrial is a drastic remedy; however, he maintains that a mistrial was warranted in this case because the trial judge "did nothing to stop the prosecutor and the State's expert witness from insinuating that defense counsel had failed to do their job and failed to carry their burden of proving that the techniques used by the expert to reach his conclusions were not based on scientific evidence."

La. C.Cr.P. art. 775 provides, in part, that "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771." A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to a defendant that deprives him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion.

*State v. Faciane*, 17-224 (La. App. 5 Cir. 11/15/17), 233 So.3d 195, 209, *writ denied*, 17-2069 (La. 10/8/18), 253 So.3d 797.

In the present case, we find no abuse of discretion in the trial court's denial of defendant's motion for mistrial. First, we note that the State did not raise the issue of defense counsel's failure to request protocols on direct examination; rather, the prosecutor's remarks and questions were made on re-direct in response to defense counsel's questions and comments about Mr. Lane's failure to attach various documents to his report. Further, we do not find that the complained of questions and answers by the prosecutor and Mr. Lane suggested any obligation on defendant's part to test the evidence or to obtain the protocols. Instead, the prosecutor was apparently attempting to point out, in light of defense counsel's criticisms of Mr. Lane's report, that the testing protocols were available to both the State and defendant. *State v. Harrison*, 17-54 (La. App. 4 Cir. 3/21/18), 239 So.3d 406, 420-21. Further, even assuming the exchange between the prosecutor and Mr. Lane was inappropriate, defendant was not substantially prejudiced since the trial court instructed the jury that the State bore the burden of proof and defendant was not required to produce any evidence.

Based on the foregoing reasons, we find that the trial court did not abuse its discretion in denying defendant's motion for a *Daubert* hearing relative to the testimony of Patrick Lane, nor in denying defendant's motion for mistrial.

## ERRORS PATENT REVIEW

We have reviewed the record for errors patent and have found no errors that require corrective action. La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

Accordingly, for the reasons set forth herein, we affirm defendant's conviction and sentence for armed robbery with a firearm, vacate his conviction

and sentence for second degree murder, and remand the matter for further

proceedings in accordance with this opinion.

**CONVICTION AND SENTENCE FOR
SECOND DEGREE MURDER VACATED;
CONVICTION AND SENTENCE FOR
ARMED ROBBERY WITH A FIREARM
AFFIRMED; REMANDED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**NOVEMBER 25, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL
PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 19-KA-594

**E-NOTIFIED**
40TH DISTRICT COURT (CLERK)
HONORABLE J. STERLING SNOWDY (DISTRICT JUDGE)
HONORABLE BRIDGET A. DINVAUT          JUSTIN B. LACOUR (APPELLEE)          CYNTHIA K. MEYER (APPELLANT)
(APPELLEE)
GRANT L. WILLIS (APPELLEE)

**MAILED**
HONORABLE JEFFREY M. LANDRY
(APPELLEE)
ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 NORTH 3RD STREET
6TH FLOOR, LIVINGSTON BUILDING
BATON ROUGE, LA 70802